UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KAREN D. MEDLOCK,<br><br>          Plaintiff,<br><br>     v.<br><br>FRED FINCH CHILDREN'S HOME,<br><br>          Defendant. | Case No. 14-cv-03000-JCS<br><br>**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. No. 33 |

## I.   INTRODUCTION

This case is before the Court on a motion for summary judgment by Defendant Fred Finch Children's Home, d/b/a Fred Finch Youth Center ("FFYC"), as to pro se Plaintiff Karen Medlock's sole remaining claim for retaliation in violation of Title VII of the Civil Rights Act of 1964. The Court took the matter under submission after Medlock did not appear at the hearing on June 19, 2015.[1] Because Medlock has identified no evidence that she engaged in any activity protected by Title VII, or any activity that she reasonably believed to be protected, there is no issue of material fact and FFYC is entitled to summary judgment. FFYC's motion is therefore GRANTED, and judgment shall be entered in favor of FFYC.[2]

## II.   BACKGROUND

### A.   Factual Background

FFYC is a nonprofit organization that provides services to troubled youth. Thompson Decl. (dkt. 33-1) ¶ 2. Medlock worked as a senior accountant at FFYC. Hsu Decl. (dkt. 33-3) ¶ 6; *see also* Compl. (dkt. 1) ¶ 5a.

---

[1] Medlock arrived at the courtroom after the hearing had concluded and the Court was in recess. The Court recognizes her good faith effort to appear at the hearing.
[2] The parties have consented to the jurisdiction of the undersigned magistrate judge for all purposes pursuant to 28 U.S.C. § 636(c).

In March of 2008, FFYC hired a new chief executive officer, Vonza Thompson, who began to review the performance of FFYC's financial services department. Thompson Decl. ¶¶ 2−3. Thompson hired an interim chief financial officer ("CFO"), George Archambeau, and worked with Archambeau to develop a restructuring plan for the finance department. *Id.* ¶¶ 3−4. In the spring of 2009, FFYC hired Ed Hsu as a full-time CFO to replace Archambeau. *Id.* ¶ 5; Hsu Decl. ¶ 1. Hsu agreed that the finance department needed to be restructured. Hsu Decl. ¶ 3. Thompson and Hsu collaborated with FFYC's chief human resources officer, Alonzo Strange, to continue to plan the reorganization. *Id.* ¶ 3 & Ex. C; Thompson Decl. ¶ 6 & Ex. A. As part of the planned restructuring, two positions—including Medlock's "Senior Accountant" position—would be replaced with two new senior positions: a "Cost/Contract Analyst" and an "Accounting Manager." Thompson Decl. ¶ 9; Hsu Decl. ¶ 4; *see also* Thompson Decl. Exs. B, C; Hsu Decl. Exs. A, B (organizational charts for the finance department before and after restructuring).[3] Medlock "do[es] not believe the restructuring plan was firmly in place until [she] pressed [her] complaint against Mr. Hsu," as discussed below. Medlock Decl. (dkt. 36) ¶ 8.

Around August 31, 2009, Hsu assigned Medlock the task of preparing a cash flow projection. Hsu Decl. ¶ 6 & Ex. D; *see also* Compl. ¶ 5a. Medlock responded by email that she had "never done cash forecasts," and asked him to confirm whether she should proceed with that assignment. Hsu Decl. Ex. D. After Hsu confirmed that he would like Medlock to work on the projection, Medlock asked a number of questions about what Hsu wanted, and Hsu responded to them. *Id.*; Medlock Decl. ¶ 6. Medlock characterizes Hsu's responses as "not at all helpful." Medlock Decl. ¶ 6. Although Hsu responded to Medlock's questions, he did not offer to help her with the report, and she did not ask him for help. *Id.* When Hsu asked Medlock about the status of the project in early September, Medlock responded as follows:

---

[3] Medlock objects to the exhibits to Thompson's and Hsu's declarations on the basis that "there is neither a creation date or author information on any of the documents," and argues that "they could have been created at any time by anyone." Opp'n (dkt. 36) ¶ 1. Both Thompson and Hsu adequately authenticate the documents in their sworn declarations. Medlock's declaration that "[p]er the EEOC investigation documentation, the proposed Finance department restructuring org chart was created 12/31/09," Medlock Decl. (dkt. 36) ¶ 3, is inadmissible hearsay, and Medlock has not provided copies of any EEOC documents to corroborate her declaration. Regardless, the organization charts are not material to the outcome of the present motion.

> Ed,
> I am not doing any further work on the report.
> Please refer any questions to Alonzo.
> Karen

Hsu Decl. Ex. D.

Around the same time, Medlock filed an internal complaint with Alonzo Strange, the human resources officer, claiming that cash flow projections did not fall within her job description and had been traditionally prepared by the CFO. *Id.* Ex. E; *see also* Compl. ¶ 5a. Medlock stated in that complaint that Hsu "needs to do his own work and not expect his staff to do it for him," and that he "is not good at communicating what he wants, which causes many problems, i.e., time wasted explaining what he wants." Hsu Decl. Ex. E. She asserted that, having told Hsu that she "do[es]n't do cash projections, his insistence that [she] do it anyway [was] akin to badgering." *Id.* As a "suggestion for resolution," she proposed that Hsu "needs to treat staff as professional colleagues, not as his personal servants." *Id.*[4]

Medlock took a leave of absence for medical reasons soon after filing her internal complaint. *See* Compl. ¶ 5a; Answer (dkt. 14) ¶ 5. During that leave, around December 15, 2009, Hsu asked Medlock to come in to work to train another employee. Medlock Decl. ¶ 5. Medlock emailed the human resources department regarding the status of her complaint, and received a copy of a report by Alonzo Strange dated October 5, 2009. *Id.* Although Strange acknowledged that other "a couple employees" reported difficulty working with Hsu, he concluded that "it is clear that the duty of preparing a cash flow report falls within the scope of [Medlock's] responsibilities," and that Medlock's refusal to perform the work was "unacceptable." Hsu Decl. Ex. F; *see also* Medlock Decl. ¶ 5 (acknowledging that the report found in Hsu's favor). Medlock "was then told not to come in" for the training. Medlock Decl. ¶ 5.

On December 31, 2009, Hsu and an employee from the human resources department met with Medlock "to notify her that the Senior Accountant position that she held was being eliminated the Department reorganization effective January 8, 2010." Hsu Decl. ¶ 10. Hsu gave

---

[4] While the record certainly does not include the entirety of Hsu's communications with Medlock and other FFYC finance department staff members, Hsu appears to have acted wholly professionally in the email exchanges with Medlock available in the record. *See* Hsu Decl. Ex. D.

Medlock a list of open positions and told her "that she was eligible to apply for one the newly created positions within the Department or any other open position at the agency." *Id.* However, Medlock "was not qualified for any of the open positions," and therefore never applied to any such position. Medlock Decl. ¶ 7; *see also* Hsu Decl. ¶ 11 ("Ms. Medlock did not apply for any position with [FFYC] or otherwise contact me in regard to any openings following our meeting on December 31, 2012 [sic]."). Instead, she "threw [the list back] at [Hsu], and stated words to the effect of . . . 'It sounds like bullshit to me. What am I going to do now? I am leaving.'" Hsu Decl. ¶ 10. Medlock told Hsu that she was not resigning but instead was going home sick. *Id.*

Hsu signed a form that day memorializing that Medlock "was terminated involuntarily" effective January 8, 2010 "because her position as Senior Accountant had been eliminated." Hsu Decl. ¶ 15 & Ex. H.

### B. Procedural History

Medlock received a right-to-sue letter from the EEOC, dated March 31, 2014, indicating that the EEOC was "unable to conclude that the information obtained establishes violations of the statutes." Compl. Ex. A. She filed her Complaint in this Court on June 30, 2014, naming FFYC, Hsu, and Thompson as defendants. *See generally* Compl. Construed liberally, the Complaint sought to bring discrimination, harassment, and retaliation claims under Title VII, as well as claims pursuant to the Family and Medical Leave Act, the False Claims Act, multiple California statutes, and the common law doctrine of wrongful termination. *See* Order Regarding Sufficiency of Complaint ("§ 1915 Order," dkt. 7) at 3.

The Court granted Medlock's application to proceed in forma pauperis on September 18, 2014, *see* dkt. 6, and completed a review of the sufficiency of her allegations pursuant to 28 U.S.C. § 1915(e)(2) on September 24, 2015. *See generally* § 1915 Order. The Court held that all of Medlock's claims except for Title VII retaliation against FFYC failed to state a claim on which relief could be granted, and dismissed her Title VII claims against Thompson and Hsu with prejudice and the remaining claims with leave to amend. *Id.* The Court allowed Medlock's retaliation to proceed based on her allegation that she was terminated after complaining to FFYC's human resources department about Hsu's "sexist attitudes." *Id.* at 9−10; Compl. ¶ 5a. After

Medlock failed to file a timely amended complaint, the Court dismissed with prejudice all remaining claims except the Title VII retaliation claim and ordered the United States Marshal to serve the Complaint on FFYC. *See* dkt. 10.

Following a case management conference on December 19, 2014, the Court provided Medlock with a notice explaining the process for and potential consequences of a motion for summary judgment. *See* dkt. 21. At a further case management conference on February 20, 2015, Medlock confirmed that she had received that notice, and the Court set a hearing date of June 19, 2015 for FFYC's Motion for Summary Judgment. *See* dkt. 31. FFYC filed its Motion (dkt. 33) on May 1, 2015, Medlock filed a late Opposition (dkt. 36) on May 29, 2015, and FFYC filed its Reply (dkt. 41) on June 5, 2015.

The Court held a hearing as scheduled on June 19, 2015. Defense counsel stated that FFYC had nothing to add beyond the arguments in its papers. Medlock failed to appear at the hearing, and the Court took the matter under submission. Medlock arrived at the courtroom after the hearing had concluded and the Court was in recess. Although the Court recognizes Medlock's good faith effort to appear, the evidentiary record in this case is sufficient to resolve the present Motion without oral argument.

### C. Arguments Regarding the Present Motion for Summary Judgment

FFYC argues that it is entitled to summary judgment for two reasons: first, because Medlock's internal complaint did not address a reasonably perceived violation of Title VII and therefore cannot constitute protected activity under that statute's anti-retaliation provision, Mot. at 6−8, and second, because there is no basis to conclude that Medlock was terminated in response to her complaint, *id.* at 8−10. In support of its Motion, FFYC submitted a declaration by Thompson addressing the development of the finance department restructuring plan and attaching FFYC business records, and a declaration by Hsu addressing that issue as well as Medlock's termination and the dispute regarding the cash flow projection. *See generally* Thompson Decl.; Hsu Decl. Hsu's Declaration attaches several exhibits: business records regarding the restructuring plan; emails sent among Hsu, Medlock, and Alonzo Strange; Medlock's internal complaint and Strange's report in response; the job description for Medlock's former position at FFYC; and an

"Employee Separation Report" regarding Medlock's termination. Hsu Decl. Exs. A−H.

In her Opposition, Medlock argues that she performed her job well, that Hsu harassed her and other employees to do menial tasks and to take on Hsu's own responsibilities, and that she had never done a cash flow projection for FFYC, which had traditionally been the CFO's responsibility. Opp'n at 2−3. She also challenges FFYC's evidence on the grounds that FFYC failed to include a declaration by former interim CFO George Archambeau addressing the development of the restructuring plan, and that "there is neither a creation date or author information on any of the documents in the Defendants [sic] Exhibits."[5] *Id.* at 2. Medlock's Opposition is supported by her own declaration, which disputes the dates of certain documents and the process of developing the restructuring plan, and describes some circumstances of her leave of absence, her interactions with Hsu, and her decision not to apply for another position. *See generally* Medlock Decl. Medlock's declaration also asserts without any further elaboration that FFYC "has settled 3 other cases brought by [her] former colleagues in the Accounting department, after Mr. Hsu was hired," and that Thompson has since been fired. *Id.* ¶ 9. Medlock does not discuss sexism or discrimination, and does not address in any way FFYC's argument that her internal complaint was not protected activity under Title VII. *See generally* Opp'n; Medlock Decl.

FFYC's Reply argues that the absence of a declaration by Archambeau is irrelevant, that there is no evidence that Medlock's internal complaint constitute Title VII protected activity or that she was fired for filing the complaint, and that her declaration should be disregarded as a sham due to minor purported inconsistencies with other evidence in the record. *See generally* Reply. FFYC also filed an objection to Medlock's declaration, arguing that each substantive paragraph of the declaration violates various rules of evidence. *See generally* Obj. to Medlock Decl. (dkt. 41-1).

### III. ANALYSIS

#### A. Legal Standard

Summary judgment on a claim or defense is appropriate "if the movant shows that there is

---

[5] Several of FFYC's exhibits do in fact include their dates and authors. *See* Hsu Decl. Exs. D−H.

1  no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of
2  law." Fed. R. Civ. P. 56(a).  In order to prevail, a party moving for summary judgment must show
3  the absence of a genuine issue of material fact with respect to an essential element of the non-
4  moving party's claim, or to a defense on which the non-moving party will bear the burden of
5  persuasion at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the movant has
6  made this showing, the burden then shifts to the party opposing summary judgment to designate
7  "specific facts showing there is a genuine issue for trial." *Id*.  "[T]he inquiry involved in a ruling
8  on a motion for summary judgment . . . implicates the substantive evidentiary standard of proof
9  that would apply at the trial on the merits." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 252
10 (1986).  On summary judgment, the court draws all reasonable factual inferences in favor of the
11 non-movant, *Scott v. Harris*, 550 U.S. 372, 378 (2007), but where a rational trier of fact could not
12 find for the non-moving party based on the record as a whole, there is no "genuine issue for trial"
13 and summary judgment is appropriate. *Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574,
14 587 (1986).

   **B.  Title VII Retaliation**

16 Title VII prohibits an employer from "discriminat[ing] against any of his employees . . .
17 because [the employee] has opposed any practice made an unlawful employment practice by this
18 subchapter, or because he has made a charge, testified, assisted, or participated in any manner in
19 an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a).  In
20 general, employers' "unlawful employment practices" under Title VII encompass discrimination
21 and harassment based on "race, color, religion, sex, or national origin." *See id.* § 2000e-2(a).

22 "To succeed on a retaliation claim, [a plaintiff] must first establish a prima facie case [by]
23 demonstrat[ing] (1) that she was engaging in a protected activity, (2) that she suffered an adverse
24 employment decision, and (3) that there was a causal link between her activity and the
25 employment decision." *Trent v. Valley Elec. Ass'n, Inc.*, 41 F.3d 524, 526 (9th Cir. 1994) (citing
26 *EEOC v. Hacienda Hotel*, 881 F.2d 1504, 1513−14 (9th Cir. 1989)).  The Ninth Circuit has long
27 held that "a plaintiff does not need to prove that the employment practice at issue was in fact
28 unlawful under Title VII," but instead "must only show that she had a 'reasonable belief' that the

7

employment practice she protested was prohibited under Title VII." *Id.* Filing a complaint with an internal human resources department "that a supervisor has violated Title VII may constitute protected activity for which the employer cannot lawfully retaliate." *EEOC v. Go Daddy Software, Inc.*, 581 F.3d 951, 963 (9th Cir. 2009). As for the causation element, "Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2528 (2013).

### C. Medlock Presents No Evidence of Protected Activity

The present motion turns primarily on the first element: whether Medlock engaged in protected activity by "oppos[ing] any practice made an unlawful employment practice by [Title VII]," *see* 42 U.S.C. § 2000e-3(a), or even a practice that she reasonably believed to be unlawful under Title VII, *see Trent*, 41 F.3d at 526. There is no evidence that she did.

Medlock alleges in her Complaint that she filed an internal complaint with the FFYC human resources department "alleging that Mr. Hsu was trying to get [Medlock] to do his work and he was creating a hostile work environment because of his constant demands and sexist attitudes." Compl. ¶ 5a. The Court previously allowed Medlock to proceed with her retaliation claim based on the allegation that her internal complaint asserted "that Hsu's 'sexist attitudes' created a 'hostile work environment.'" *See* § 1915 Order at 10 (quoting Compl. ¶ 5a). At this stage, however, when Medlock must support her allegations with evidence, there is no *evidence* that her internal complaint implicated sex discrimination or sexual harassment in any way.[6] Instead, the evidence in the record indicates that her internal complaint was limited to Hsu's purported "constant demands," with no mention of "sexist attitudes."

Medlock's internal complaint appears in the record as Exhibit E to Hsu's declaration.[7] The complaint consists of two sections. The first, "Basis of Complaint," reads as follows:

---

[6] The allegations of Medlock's judicial Complaint "are not 'evidence.'" *See White v. FedEx Corp.*, No. C04-00099 SI, 2006 WL 618591, at *1 (N.D. Cal. Mar. 13, 2006).
[7] Medlock does not appear to dispute the authenticity of this document. Although she argues generally that "there is neither a creation date or author information on any of the documents in the Defendants [sic] Exhibits," *see* Opp'n at 2, that is not true of this exhibit, which bears Medlock's signature as the author and is dated September 2, 2009. *See* Hsu Decl. Ex. E.

> Ed asked me to do a report (cash flow projection) that is clearly not in my area of responsibility (see my attached email). After I told him I did not do cash flow projections, he insisted that I do it anyway. Per my job description, this is not a function I am responsible for. I looked at Ed's job description and it is very vague, but traditionally, the CFO has done cash flow projections. Ed is not good communicating [sic] what he wants, which causes many problems, i.e., time wasted trying to clarify what he wants.
>
> I realize some of the communication problems may be related to languages skills, but it is still a challenge.
>
> And since I already told him I don't do cash projections, his insistence that I do it anyway is akin to badgering. Other employees in the department feel the same pressure from him, but they are afraid to say anything because they believe there is no recourse within FFYC. I am not sure there is either, but I have health problems that are exacerbated by stress, so I can't work in an increasingly difficult environment. Brenda, Coretta, Marijean, and Erin all support my claim.

Hsu Decl. Ex. E. The second part, "Suggestions for resolution," similarly addresses only the scope of Hsu's and Medlock's respective duties:

> Ed needs to treat staff as professional colleagues, not as his personal servants. I can do a cash flow projection, but it's not in my job description here, and I don't have the necessary information to do it. Ed needs to do his own work and not expect his staff to do it for him because we are not getting paid to do his work, but he is. This has been a problem from the beginning, and no one in the department feels comfortable enough to talk directly with Ed, or with Vonza or HR. I have already discussed my issues with him with my supervisor, and she doesn't believe she can confront him and have the support of FFYC. No one does, and that's why no one is willing to confront the issue, except me.

*Id.* The only other evidence that sheds any light on Medlock's complaints regarding Hsu are emails among Medlock, Hsu, and Alonzo Strange, and the report that Strange prepared in response to Medlock's complaint. Hsu Decl. Exs. D, F. Those documents also reflect only complaints regarding the cash flow project that Hsu assigned to Medlock, with no indication that he gave her the assignment on account of her sex or otherwise exhibited sexism in any way. *See id.* Hsu also states in his declaration that "[a]t no point in time during [Medlock's employment] did she ever complaint to [Hsu], or [to Hsu's knowledge] to others, that [Hsu] discriminated against her in any manner at all, including, but not limited to, her gender, age, race or anything of that type." Hsu Decl. ¶ 8.

Filing an internal complaint "that a supervisor has violated Title VII may constitute

9

protected activity," *Go Daddy Software*, 581 F.3d at 963, but that principle does not extend to an internal complaint that has no relation to Title VII discrimination. Even assuming for the sake of argument that Medlock's job description at FFYC did not encompass cash flow reports, Title VII does not prohibit an employer asking an employee to perform tasks outside of his or her job description, at least absent any connection to discrimination or harassment on account of an employee's "race, color, religion, sex, or national origin." *See* 42 U.S.C. § 2000e-2(a). Any shortcoming in a supervisor's communication skills similarly falls well outside the scope of the statute. Medlock's internal complaint did not address her membership in a protected class in any way. Accordingly, even drawing all reasonable inferences in Medlock's favor, no rational jury could find that she engaged in activity protected by Title VII by filing her complaint with the FFYC human resources department.

Summary judgment is appropriate where a plaintiff has failed to raise any issue of material fact as to an essential element of her claim. *See Celotex*, 477 U.S. at 323. Here, because Medlock has identified no evidence that she engaged in protected activity, FFYC is entitled to summary judgment as to her Title VII retaliation claim, the sole remaining claim in the case. *See Trent*, 41 F.3d at 526 (identifying protected activity as an essential element of a retaliation claim). The Court need not reach the parties arguments regarding the basis for Medlock's termination—even if she was terminated in response to her internal complaint, that would not support a Title VII claim because filing a workplace grievance unconnected to any protected class is not protected activity.[8]

## IV. CONCLUSION

For the reasons stated above, the Motion for Summary Judgment is GRANTED. The clerk is instructed to enter judgment in favor of Defendant Fred Finch Children's Home.

**IT IS SO ORDERED.**

Dated: June 22, 2015

JOSEPH C. SPERO
Chief Magistrate Judge

---

[8] Because the Court need not address the issue of why Medlock was terminated, the Court does not reach Medlock's argument regarding FFYC's failure to provide a declaration by George Archambeau to support its position that the restructuring plan predated Medlock's internal complaint. *See* Opp'n at 2.

10